NOT FOR PUBLICATION

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW JERSEY
## CAMDEN VICINAGE

|  |  |  |
|---|---|---|
| MARGARET GOODE, et al., | : | |
| | : | |
| Plaintiffs, | : | |
| | : | Civil No. 16-03936 (RBK/JS) |
| v. | : | |
| | : | **OPINION** |
| CAMDEN CITY SCHOOL DISTRICT, et al., | : | |
| | : | |
| Defendants. | : | |

**KUGLER**, United States District Judge:

This matter comes before the Court on Defendants Camden City School District (the "District"), Keith Miles, and Hye-Won Gehring's Motion for Summary Judgment (Doc. No. 95) and Motion to Seal Exhibits A through N attached to their Motion for Summary Judgment (Doc. No. 99). The case concerns allegations that Defendants implemented a plan to purge the District of older teachers by deliberately sabotaging their performance evaluations, and then further retaliated against certain of those teachers when they spoke out about these instances of age-discrimination. After more than three years and five complaints, six plaintiffs—Margaret Goode, Nicole Mann, Jessica Dequito, Theresa Atwater, Jacqueline Ballinger, and Rena Pierce—are bringing claims against the above three Defendants for age-discrimination in violation of the Age Discrimination in Employment Act of 1967 ("ADEA"), 29 U.S.C. § 621 *et seq*., and the New Jersey Law Against Discrimination ("NJLAD"), N.J.S.A. 10:5–12a, for retaliation against activity protected by the First Amendment under 42 U.S.C. § 1983 and the New Jersey Civil Rights Act ("NJCRA"), N.J.S.A. 10:6–2(c), for retaliation against whistleblowing activity in violation of the

1

Conscientious Employee Protection Act ("CEPA"), N.J.S.A. 34:19–1 *et seq*., and for arbitrary and unjust activity in violation of the New Jersey doctrine of fundamental fairness. Only Plaintiff Pierce's claims under the NJLAD, Section 1983, the NJCRA, and the CEPA withstand summary judgment. As such, Defendants' motion for summary judgment is **GRANTED IN PART** and **DENIED IN PART**.

## I.     BACKGROUND

### A.  Factual Background

Plaintiffs were all teachers in the District at the start of the 2013-14 school year. (Doc. No. 61 ("FAC") at ⁋⁋ 16–22). Defendant Miles was the principal of Woodrow Wilson High School during the 2014-15 and 2015-16 school years, while Defendant Gehring was the co-principal of the R.T. Cream Family School for the 2013-14 and 2014-15 school years. (*Id*. at ⁋⁋ 25–26). The Camden City Board of Education approved the full intervention of the New Jersey Board of Education, pursuant to the Quality Single Accountability Continuum Act, N.J.S.A. 18A:7A–49(e), effective June 23, 2013. (Doc. No. 95-1 ("Def. SUMF") at ⁋ 4).

In 2012, the New Jersey Legislature enacted the Teacher Effectiveness and Accountability for the Children of New Jersey ("TEACHNJ") Act, N.J.S.A. 18A:6–117 *et seq*., which allowed school districts to develop their own evaluation rubrics to assess teacher effectiveness. (FAC at ⁋⁋ 31–32). The TEACHNJ Act required evaluation rubrics to include four defined annual summative ratings categories: ineffective, partially effective, effective, and highly effective. N.J.S.A. 18A:6–123(b). Under this Act, district superintendents are required to forward a tenure charge of inefficiency to the Commissioner of Education if: a) the annual summative rating is partially effective and the teacher receives an annual summative rating of ineffective the next school year, N.J.S.A. 18A:6–17a(1); or (b) the annual summative rating is partially effective and the teacher

receives an annual summative rating of partially effective the next school year, except that upon a finding of exceptional circumstances by the district superintendent deferment of the forwarding of tenure charges would be permitted pending the next annual evaluation. N.J.S.A. 18A:6–17.3a(2). If tenure charges are sustained, teachers are not only fired but also risk losing their pensions, benefits, and certifications. (FAC at ¶ 116).

During the 2013-14 school year, Paymon Rouhanifard was the Superintendent of Schools for the District. (*Id*. at ¶ 23). According to Plaintiffs, Rouhanifard implemented a policy to use the District's new evaluation rubric (the "Danielson Rubric"), created pursuant to the TEACHNJ Act, as pretext to pressure teachers over the age of forty to retire. (*Id*. ¶ 35). This policy required evaluators to give unduly low evaluation scores to older teachers, as well as surreptitiously recording the teachers during the evaluations, in violation of their union's collective bargaining agreement with the District. (*Id*. at ¶¶ 36–41). Miles and Gehring were allegedly responsible for implementing this policy at their schools. (*Id*. at ¶ 43–48).

### i. Margaret Goode

Goode is sixty-eight years old and was employed as a science teacher with tenure at the R.T. Cream Family School. (Def. SUMF at ¶ 14). During the 2013-14 school year, Goode was evaluated under the Danielson rubric on numerous occasions, including once by Defendant Gehring, and received an annual summative evaluation score of 2.6, which classified her as partially effective. (*Id*. at ¶ 19–20). In accordance with the TEACHNJ Act, Goode was then placed on a Corrective Action Plan ("CAP") for the 2014-15 school year. (*Id*. at 21).

According to Goode, during the 2013-14 school year she began to notice that younger teachers were receiving positive evaluations under the Danielson rubric while older teachers were receiving poor evaluations. (Doc. No. 104–2 ("Pl. SDF") at ¶¶ 230–238). She also began to suspect

that the evaluators were tape recording the evaluations. (*Id.* at ⁋ 239). As her suspicions grew, she made a number of complaints about the evaluation process: (1) at a meeting with Kim Buell-Alves, a representative of the District; (2) in a May 12, 2014 letter to Superintendent Rouhanifard (Doc. No. 104-17); (3) in a May 13, 2014 letter to Commissioner of Education David Hespe (Doc. No. 104-18); (4) in a June 23, 2014 letter to Superintendent Rouhanifard (Doc. No. 104-19); and (5) in an August 21, 2014 Petition to the Camden Board of Education (Doc. No. 104-20).

During the 2014-15 school year, Goode was evaluated under the Danielson rubric five times and received a summative evaluation score of 2.62, again qualifying as partially effective. (Def. SUMF at ⁋⁋ 25–26). According to Goode, her fourth evaluator, Hope Edwards-Perry, informed her that Gehring arranged for Goode to have a fifth evaluation in order to ensure that she would have a partially effective summative rating. (Pl. SDF at ⁋ 248–49).

On July 7, 2015, Goode sent Rouhanifard a letter voicing her complaints with the evaluation process and requesting a new Corrective Action Plan for the coming school year. (Def. SUMF at ⁋ 27). On August 21, 2015, Goode received correspondence from Rouhanifard, enclosing tenure charges based on her having received a partially effective rating in consecutive years, pursuant to the TEACHNJ Act. (*Id.* at ⁋ 29). Rather than contest the charges, Goode delivered a letter to Rouhanifard announcing her retirement on September 9, 2015. (*Id.* at ⁋ 31).

### ii. *Rena Pierce*

Pierce is sixty-nine years old and was employed as a special education teacher with tenure at the Woodrow Wilson High School in the District. (*Id.* at ⁋ 61). She also asserts that she was a representative for the teacher's union. (Pl. SDF at ⁋ 315). During the 2013-14 school year, Pierce had one or two classes outside of her main classroom, requiring her to move from one building to another across a breezeway. (Def. SUMF at ⁋⁋ 67–68; Doc. No. 95-13 at 63). When she moved

from classroom to classroom, Pierce brought a substantial amount of equipment with her, weighing around fifty-five pounds. (Def. SUMF at ⁋ 68). Nevertheless, Pierce did not raise a complaint about her schedule during the 2013-14 school year. (*Id.* at ⁋ 69). At the end of the year, she received a summative rating of 2.93 under the Danielson rubric, classifying her as effective. (*Id.* at ⁋ 70).

During the 2014-15 and 2015-16 school years, Defendant Miles served as the principal of Woodrow Wilson High School while Cameron Baynes and Genevieve Byrd-Robinson served as the lead educators. (*Id.* at ⁋⁋ 62–63). Pierce asserts that she initially had a good relationship with Miles, and that he even had her serve in a "principal's cabinet." (Pl. SDF at ⁋⁋ 309–11). During some of the principal's cabinet meetings Pierce objected to Miles's proposals, telling him that they were a violation of the collective bargaining agreement, state law, or federal law. (*Id.* at ⁋ 312–13). After speaking up in this manner, Miles stopped inviting her to principal's cabinet meetings. (*Id.* at ⁋ 317). She also objected when she believed that Miles was audio recording a staff meeting. (*Id.* ⁋ 319).

Due to these incidents, Pierce contends that she became Miles's "enemy." (*Id.* at ⁋ 320). Her classroom was taken away at some point in the 2014-15 school year and her schedule changed forcing her to walk between classes more frequently, still traversing the breezeway. (*Id.* at ⁋ 322; Doc. No. 95-14 at 7–8). She continued to tote the fifty-five pounds of equipment with her, and her new schedule required her to carry that load up and down steps. (Pl. SDF at ⁋ 323). Further, her special education class was moved to a classroom without visual aids. (*Id.* at ⁋ 353).

 Pierce's schedule got worse during the 2015-16 school year, as the buildings she had to travel between were farther apart, and her duty locations were farther from the classrooms. (*Id.* at ⁋ 325). Additionally, she was assigned to teach honors and general education students, rather than

only special education students. (*Id*. at ¶¶ 331–32). She contends that the schedule changes came at Miles's direction. (*Id*. at ¶ 348).

Pierce also began to notice that other older teachers were also forced to move between classrooms, and that other older special education teachers were denied classrooms with visual aids. (*Id*. at ¶¶ 324, 352). Starting in the middle of the 2014-15 school year she began raising these issues with Miles at staff meetings, speaking in her capacity as a union representative. (*Id*. at ¶¶ 356–59). After one such staff meeting, Pierce alleges that Miles said to her that he knew he would have a problem with the older teachers transitioning to the Woodrow Wilson way. (*Id*. at ¶ 361). On other occasion, Miles told Pierce that she reminded him of his mother, which she took to be a comment on her age. (*Id*. at ¶ 364). On one or both of these occasions, Miles remarked that "you can't teach an old dog new tricks." (*Id*. at ¶ 362).

On November 3, 2014 Miles observed Pierce and evaluated her as "effective" under the Danielson rubric. (Def. SUMF at ¶ 72). On December 10, 2014, Byrd-Robinson observed Pierce and scored her as "ineffective" in the "Setting Instructional Outcomes" section of the evaluation." (*Id*. at ¶ 74). Dissatisfied with this evaluation, Pierce requested in-class coaching or modeling with her students. (*Id*. at ¶ 75). On February 9, 2015, Baynes observed Pierce and scored her as "ineffective" or "partially effective" in many sections of the evaluation. (*Id*. at ¶ 76). Prior to this evaluation, Pierce asserts that Baynes had not done any in-class coaching for her, nor did he do so afterwards. (Pl. SDF at ¶¶ 368–69). Other teachers, a majority over the age of forty, complained to Pierce that Baynes was not coaching them either. (*Id*. at ¶ 370). Pierce continued to make complaints to Miles and other school officials about the schedule changes, the evaluation process, the tape recording of meetings and evaluations, and other issues. (*Id*. at ¶¶ 349–50, 360, 371, 380–81).

At the conclusion of the 2014-15 school year, Pierce received a summative score of partially effective and was placed on a CAP for the 2015-16 school year. (Def. SUMF at ¶ 79). On November 4, 2015, Byrd-Robinson observed Pierce and scored her as "ineffective" or "partially effective" in many sections of the evaluation. (*Id*. at ¶ 81). At the conclusion of the 2015-16 school year, Pierce again received a summative score of partially effective. (*Id*. at ¶ 86). On February 29, 2016, she announced her retirement from the District via a letter, with an effective date of May 1, 2016. (*Id*. at ¶ 90). On March 2, 2016, she filed five "Inquiry and Complaint Forms" with her union raising various issues about how Miles and the District treated her. (*Id*. at ¶ 89).

### iii.  Jacqueline Ballinger

Ballinger is fifty-four years old and was employed as a certified special education teacher with tenure at the Cooper B. Hatch Family School and then at the Camden High School in the District. (*Id*. at ¶¶ 42, 44).  At the conclusion of the 2013-14 school year, she received a summative score of 2.19, classifying her as partially effective, and was placed on a CAP for the 2014-15 school year. (*Id*. at ¶ 47). At the conclusion of the 2014-15 school year, Ballinger received a 2.25 summative score under the Danielson rubric, again classifying her as partially effective. (*Id*. at ¶ 50).

On August 31, 2015, Ballinger received a Notice from Emily Nielson, the Chief Talent Officer of the District's Division of Talent and Labor Relations, rescinding her placement for the 2015-16 school year and placing her on administrative leave with pay, due to her low evaluation scores and other issues. (*Id*. at ¶ 54). However, Ballinger was never fired; rather she requested and was approved for medical leave, upon which she apparently remains. (*Id*. at ¶¶ 55–59).

### iv.  Theresa Atwater

Atwater, born May 21, 1960, was employed with the District at the R.T. Cream Family School as a special education teacher. (*Id*. at ¶¶ 95–96). At the conclusion of the 2013-14 school year, Atwater's summative evaluation score was 2.39, classifying her as partially effective, and she was placed on a CAP for the 2014-15 school year. (*Id*. at ¶ 98). Her summative evaluation score for the 2014-15 school year again classified her as partially effective. (*Id*. at ¶ 101). On August 31, 2015 Atwater was placed on administrative leave with pay, in part due to her low evaluation scores, and resigned her employment on June 23, 2016. (*Id*. at ¶¶ 102–03).

###### v. *Nicole Mann*

Mann, born June 20, 1970, was employed by the District at the R.T. Cream Family School from April 2003 through October 22, 2015. (*Id*. at ¶¶ 104-05). Her summative evaluation score under the Danielson rubric for the 2013-14 school year was 2.19, classifying her as partially effective, and she was placed on a CAP for the 2014-15 school year. (*Id*. at ¶¶ 107–08). At the conclusion of the 2014-15 school year, her summative evaluation score was 2.58, again classifying her as partially effective. (*Id*. at ¶ 110). On August 21, 2015 she was notified by Rouhanifard that she was being brought up on tenure charges and was suspended with pay; rather than contest the charges, she resigned. (*Id*. at ¶¶ 111–12).

###### vi. *Jessica Dequito*

Dequito, born July 16, 1954, was employed by the District at the R.T. Cream Family School as a special education teacher (*Id*. at ¶¶ 113–14). Her summative evaluation score under the Danielson rubric for the 2013-14 school year was 2.6, classifying her as partially effective, and she was placed on a CAP for the 2014-15 school year. (*Id*. at ¶ 117). At the conclusion of the 2014-15 school year, Dequito received an evaluation score of 2.48, again classifying her as partially effective. (*Id*. at ¶ 119). On August 21, 2015, Dequito received notice from Rouhanifard that she

was being brought up on tenure charges was suspended with pay; rather than contest the charges, Dequito resigned her employment on September 2, 2015. (*Id*. at ¶ 121).

**B. Procedural History**

Plaintiffs commenced this action by filing their Complaint in this Court on June 30, 2016 (Doc. No. 1). At that time, Dolores Everette was also a plaintiff, and Cameron Baynes, Laura Boyce, Genevieve Byrd-Robinson, Gloria Martinez-Vega, and Paymon Rouhanifard were additional defendants. Defendants moved to dismiss the Complaint (Doc. No. 13), and Plaintiffs responded by filing an Amended Complaint (Doc. No. 15); Defendants moved to dismiss again (Doc. No. 18).

After this Court issued an Opinion (Doc. No. 23) and an Order (Doc. No. 24) on May 24, 2017 dismissing the Amended Complaint in part, Plaintiffs filed a new Complaint in the Superior Court of New Jersey on June 28, 2017 (Notice of Removal, Goode v. Camden City Sch. Dist., No. 17-6330, (D.N.J. Aug. 22, 2017) (Doc. No. 1) ("NR")). Plaintiffs then filed an Amended Complaint (Doc. No. 32) in this action on July 10, 2017. On August 22, 2017, Defendants removed the state court complaint to this Court, where it was filed under Docket Number 17-6330 (NR). Finally, on October 2, 2017, the two matters were consolidated into one case under Docket Number 16-3936 (Doc. No. 36).

Plaintiffs filed the present Fourth Amended Complaint on April 5, 2018. Subsequently, the parties stipulated to the dismissal of certain claims (Doc. Nos. 89, 93, 108). As a result, Everette is no longer a plaintiff, and Baynes, Boyce, Byrd-Robinson, Martinez-Vega, and Rouhanifard are no longer defendants. Additionally, Plaintiffs are no longer bringing any claims against Defendant Miles for his actions at the R.T. Cream Family School. Defendants filed the present Motion for Summary Judgment on May 16, 2019. Plaintiffs filed their Opposition on July 22, 2019 (Doc. No.

104 ("Pl. Brief")), and Defendants submitted their Reply (Doc. No. 107 ("Reply")) on August 12, 2019.

### C. Plaintiffs' Claims

At this time, Plaintiffs are bringing the following claims:

<u>Count I</u>: All remaining Plaintiffs bring a claim against the District under the ADEA for age-discrimination.

<u>Count II</u>: Pierce brings a claim against the District under the ADEA for creating a hostile work environment.

<u>Count III</u>: Goode and Pierce bring claims against Gehring and Miles, respectively, under Section 1983 for retaliation against activity protected by the First Amendment.

<u>Count IV</u>: All Plaintiffs bring a claim under the NJLAD against the District for age-discrimination.

<u>Count V</u>: Plaintiff Pierce brings a claim under the NJLAD against the District for creating a hostile work environment.

<u>Count VI</u>: Goode, Mann, Dequito, Atwater and Pierce bring claims under the NJLAD for age-discrimination, the first four against Gehring, while Pierce only against Miles.

<u>Count VII</u>: Pierce brings a claim under the NJLAD against Miles for creating a hostile work environment.

<u>Count VIII</u>: Goode and Pierce bring claims against Gehring and Miles, respectively, under the NJCRA for retaliation against activity protected by the First Amendment.

<u>Count IX</u>: All Plaintiffs bring claims against Miles and Gehring under the New Jersey Doctrine of Fundamental Fairness.

<u>Count X</u>: Goode and Pierce bring claims for violations of the CEPA, Goode against the District and Gehring, Pierce against the District and Miles.

## II.    LEGAL STANDARD

The court should grant a motion for summary judgment when the moving party "shows that there is no genuine dispute as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). An issue is "material" to the dispute if it could alter the outcome, and a dispute of a material fact is "genuine" if "a reasonable jury could return a verdict for the non-moving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986); *Matsushida Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) ("Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no 'genuine issue for trial.'") (quoting *First National Bank of Arizona v. Cities Service Co.*, 391 U.S. 253, 289 (1968)). In deciding whether there is any genuine issue for trial, the court is not to weigh evidence or decide issues of fact. *Anderson*, 477 U.S. at 248. Because fact and credibility determinations are for the jury, the non-moving party's evidence is to be believed and ambiguities construed in his favor. *Id*. at 255; *Matsushida*, 475 U.S. at 587.

Although the movant bears the burden of demonstrating that there is no genuine issue of material fact, the non-movant likewise must present more than mere allegations or denials to successfully oppose summary judgment. *Anderson*, 477 U.S. at 256. The nonmoving party must at least present probative evidence from which jury might return a verdict in his favor. *Id.* at 257. The movant is entitled to summary judgment where the non-moving party fails to "make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).

## III.   DISCUSSION

The Court begins by assessing Defendants' contention that the doctrine of sovereign immunity bars all of Plaintiffs' claims. Next, the Court turns to Goode and Pierce's claims under

Section 1983 and the NJCRA regarding retaliation against activity protected by the First Amendment. The Court then discusses Goode and Pierce's related claims for retaliation against whistleblowing activity under the CEPA. Finally, the Court analyzes Plaintiffs' claims under the NJLAD before briefly examining their claims under the New Jersey doctrine of fundamental fairness.

### A. Sovereign Immunity

The Eleventh Amendment "has been interpreted to render states—and, by extension, state agencies and departments and officials when the state is the real party in interest—generally immune from suit by private parties in federal court." *Pa. Fed'n of Sportsmen's Clubs, Inc. v. Hess*, 297 F.3d 310, 323 (3d Cir. 2002) (internal quotation omitted). Accordingly, New Jersey state agencies "established in the Executive Branch of State Government" qualify for Eleventh Amendment sovereign immunity, "regardless of the relief sought," unless an exception to the immunity rule applies. *See Rhett v. Evans*, 576 F. App'x 85, 88 (3d Cir. 2014) (internal quotation omitted). Those exceptions apply when (1) Congress abrogates the immunity, (2) a state waives immunity, or (3) when a plaintiff sues an individual state officers for prospective relief to end an ongoing violation of federal law. *See MCI Telecomm. Corp. v. Bell Atl. Pennsylvania*, 271 F.3d 491, 503 (3d Cir. 2001). Defendants assert that the doctrine of sovereign immunity bars all of Plaintiffs' claims.

### i. Counts I & II—ADEA Claims Against the District

In Counts I and II all Plaintiffs bring claims under the ADEA against Defendant Camden City School District. It is well established that the ADEA did not validly abrogate the state's sovereign immunity. *Shahin v. Delaware*, 345 F. App'x 815, 817 (3d Cir. 2009); *see Kimel v. Fla. Bd. of Regents*, 528 U.S. 62 (2000) ("The ADEA's purported abrogation of the States' sovereign

immunity is accordingly invalid."). It is also well established that New Jersey has not waived its immunity from suit under the ADEA. *See Flagg v. New Jersey*, No. 17-2602, 2018 WL 4110949, at *2 (D.N.J. Aug. 29, 2018) (barring ADEA claim against New Jersey state agency); *Allen v. New Jersey*, No. 16-8661, 2017 WL 3086371 (D.N.J. July 20, 2017) (barring ADEA claim against New Jersey state agency).

As such, the only issue is whether the Defendant District is an "arm of the State" immune from suit. Municipal subdivisions such as school districts are not typically covered by the doctrine of sovereign immunity. But the Camden City School District is a special case. At all times relevant to this lawsuit the District has been subject to the control of the New Jersey Board of Education. (Def. SUMF at ¶ 4). As such, the Third Circuit has concluded that the District is an arm of the state entitled to sovereign immunity. *See Denkins v. State Operated Sch. Dist. of Camden*, 715 F. App'x 121, 126 (3d Cir. 2017). Plaintiffs offer no reason why this court should reject the Third Circuit's analysis in *Denkins*. Consequently, the Court finds that the District is entitled to sovereign immunity and all of the ADEA claims are dismissed.

### ii. *Counts IV, V, & X—Defendant District*

In Counts IV, V, and X, Plaintiffs bring claims under the NJLAD and the CEPA against the District. Ordinarily, private plaintiffs may not bring suit against arms of the state under state law in federal court by virtue of the Eleventh Amendment. *See, e.g. Jasmin v. N.J. Econ. Dev. Auth.*, No. 16-1002, 2018 WL 3617955, at *8 (D.N.J. July 30, 2018) (finding that New Jersey state agency could not be sued under the NJLAD in federal court). But the tortured procedural history of this case makes things more complicated. Plaintiffs contend that the District waived its sovereign immunity when it removed the parallel state case to this Court in August 2017. (Pl. Brief at 47–48). Defendants respond that this removal did not waive the District's sovereign immunity

because it was necessary to avoid simultaneous litigation, and the Plaintiffs initially chose to litigate this case in federal court. (Reply at 11–12).

Plaintiffs are correct that "when a state entity removes to federal court, it waives its right to contest the federal court's authority to hear the case." *Wilson v. N.J. Dep't of Corr.*, No. 16-7915, 2017 WL 4618156, at *8 (D.N.J. Oct. 13, 2017) (citing *Lapides v. Bd. of Regents of Univ. Sys. of Ga.*, 535 U.S. 613, 620 (2002)). However, the state's waiver by removal must be voluntary. *Pratt ex rel. Pratt*, No. 15-5778, 2018 WL 4251866, at *4 (D.N.J. Sept. 6, 2018). Further, courts must "indulge every reasonable presumption against waiver." *Lombardo v. Pa. Dep't of Public Welfare*, 540 F.3d 190, 198 (3d Cir. 2008) (internal quotation omitted). Given this instruction, the District's decision to remove was not voluntary. *See Castro v. Atlantic Cty.*, No. 15-2041, 2018 WL 3122065, at *9 n.9  (D.N.J. June 25, 2018) (holding sovereign immunity was not waived by plaintiff's "procedural gamesmanship" of first filing a federal complaint and then filing "duplicative state court complaints" that state defendants removed and consolidated into the pending federal action). As such, sovereign immunity applies, and Plaintiffs may not litigate their state law claims against the District in this forum.

### iii.   *Counts III, VI, VII, VIII, & X—Individual Defendants*

In Count III, Plaintiffs Goode and Pierce bring claims under 42 U.S.C. § 1983 against Defendants Gehring and Miles in their individual capacities. It is beyond a doubt that state officials may be sued under Section 1983 in their individual capacities; the statute would be a dead letter if they could not. *See Estate of Lagano v. Bergen Cty. Prosecutor's Office*, 769 F.3d 850, 856 (3d Cir. 2014). Defendants' arguments concerning suits against officials sued in their official capacity are simply not on point, and as such these individual capacity claims are not barred by sovereign immunity.

In Counts VI, VII, VIII, and X, Plaintiffs bring state law claims against Miles and Gehring in their individual capacities. Defendants contend that all of these claims are barred under *Pennhurst State Sch. & Hosp. v. Halderman*, which held that private plaintiffs could not enforce state laws against states or state officials in federal court. 465 U.S. 89 (1984). But Defendants appear to miss that *Pennhurst*'s holding is limited to cases in which "the relief sought and ordered has an impact directly on the State itself." *Id.* at 117. When the plaintiff brings suit against state officials in their individual capacity, the state is not the real party in interest, and consequently there is no sovereign immunity bar. *Melo v. Hafer*, 912 F.2d 628, 635 (3d Cir. 1990) *aff'd* 502 U.S. 21 (1991). As such, none of these claims are barred by the doctrine of sovereign immunity.[1]

## B. First Amendment Retaliation—Section 1983 and NJCRA

In Count III, Plaintiffs Goode and Pierce bring claims under 42 U.S.C. § 1983 and the NJCRA for retaliation in violation of the First Amendment.[2] Goode's claim is solely against Defendant Gehring, while Pierce's claim is solely against Defendant Miles.[3] Defendants assert that Miles and Gehring are entitled to qualified immunity. (Doc. No. 95-25 ("Def. Brief") at 22–23).

Qualified immunity is an affirmative defense that "shields government officials from civil damages liability unless the official violated a statutory or constitutional right that was clearly established at the time of the challenged conduct." *Taylor v. Barkes*, 135 S. Ct. 2042, 2044 (2015) (quoting *Reichle v. Howards*, 132 S. Ct. 2088, 2093 (2012)). However, qualified immunity will

---

[1] In their Reply, Defendants assert that claims against state officials in their individual capacity are only allowed if the officials were acting outside the scope of their employment. (Reply at 9). The case they rely on for this proposition, *Feliz v. Kintock Grp.*, was discussing aspects of Pennsylvania state law that are wholly irrelevant to this proceeding. 297 F. App'x 131, 137 (3d Cir. 2008). As such, this argument carries no water.
[2] Courts in this Circuit have consistently interpreted the NJCRA and Section 1983 analogously, *see Szemple v. Corr. Med. Servs., Inc.*, 493 F. App'x 238, 241 (3d Cir. 2012), and New Jersey courts have extended that approach to the issue of qualified immunity. *See, e.g.*, *Ramos v. Flowers*, 56 A.3d 869, 876 (N.J. Super. Ct. App. Div. 2012). Neither party objects to this approach, and as such the Court analyzes Plaintiffs' Section 1983 and NJCRA claims in tandem.
[3] Plaintiff Ballinger was also bringing a Section 1983 and NJCRA claim against Defendant Rouhanifard. But as Rouhanifard has been dismissed with prejudice from this action, (Doc. No. 108), Ballinger's claim against him cannot continue.

not, act as a shield for "the official who knows or should know he is acting outside the law." *Noble v. City of Camden*, 112 F. Supp. 3d 208, 225 (D.N.J. 2015) (quoting *Butz v. Economou*, 438 U.S. 478, 506–07 (1978)). In deciding whether qualified immunity applies, the Court must decide whether the facts alleged, taken in a light most favorable to the plaintiff, make out: (1) a violation of a constitutional right; and (2) that the constitutional right at issue was "clearly established" at the time of a defendant's alleged misconduct. *Saucier v. Katz*, 533 U.S. 194, 201 (2001). Courts may consider these issues in either order. *Id.* at 236.

Although the question of qualified immunity is generally a question of law, "a genuine issue of material fact will preclude summary judgment on qualified immunity." *Giles v. Kearney*, 571 F.3d 318, 326 (3d Cir. 2009); see also *Curley v. Klem*, 298 F.3d 271, 278 (3d Cir. 2002) (noting that "a decision on qualified immunity will be premature when there are unresolved disputes of historical fact relevant to the immunity analysis"). In other words, the Court must deny summary judgment if, on a plaintiff's version of the facts, defendants violated the plaintiff's clearly established constitutional rights.

On the merits of the alleged First Amendment violation, the crux of the parties' dispute is whether Goode and Pierce's grievances sufficiently touched upon matters of public concern so as to merit constitutional protection. Goode and Pierce both assert that their activity was protected by the Speech Clause, while Goode also claims protection under the Petition Clause.[4] (Pl. Brief at 27–

---

[4] Pierce also asserts a claim under the Free Association Clause, but Plaintiff's briefing leads the Court to conclude she really means that the Speech Clause protects her activity as a union representative. (Pl. Brief at 29). The Third Circuit has recognized Free Association claims based on public employees' membership in unions and for the union's decision to file a grievance as being distinct from claims under the Free Speech clause for "retaliation based on the substance of the grievance." *Baloga v. Pittston Area Sch. Dist.*, 927 F.3d 742, 754 (3d Cir. 2019). Under the Third Circuit's approach, pure association claims for membership in a labor union do not require the public concern analysis required for speech claims. *Palardy v. Twp. Of Millburn*, 906 F.3d 76, 82–83 (3d Cir. 2018). In their briefing, Plaintiffs write that "Pierce's claim under the Association Clause must be decided using the same public concern test as under the Speech and Petition Clauses." (Pl. Brief at 29). As Plaintiffs believe the speech test applies to Pierce's claim, the Court is operating under the belief that Pierce is raising a Speech Clause claim for retaliation

29). To establish any of these First Amendment retaliation claims, Goode and Pierce must show that "(1) [their] activity is protected by the First Amendment and (2) the activity was a substantial or motivating factor in the alleged retaliatory action, which, if both are proved, shifts the burden to the employer to prove that (3) the same action would have been taken even if the activity had not occurred." *Dougherty v. Sch. Dist. of Phila.*, 772 F.3d 979 (3d Cir. 2014) (citing *Gorum v. Sessoms*, 561 F.3d 179, 184 (3d Cir. 2009); *see also Borough of Duryea, Pa. v. Guarnieri*, 564 U.S. 379, 398 (2011) (applying Speech Clause framework to Petition Clause claim). Defendants focus exclusively on the first prong, which is "solely a question of law." *Miller v. Clinton Cty.*, 544 F.3d 542, 548 (3d Cir. 2008).

In order for public employee activity to receive First Amendment protection, the employee must have been acting as a citizen, rather than employee, on a matter of public concern, and the government must "lack an adequate justification for treating the employee differently than the general public based on its needs as an employer under the *Pickering* balancing test." *Munroe v. Central Bucks Sch. Dist.*, 805 F.3d 454, 466 (3d Cir. 2015) (internal quotation omitted); *see also Pickering v. Bd. of Educ.*, 391 U.S. 563, 568 (1968). "The *Pickering* balancing test requires the courts to balance the interests of the employee, as a citizen, in commenting upon matters of public concern and the interest of the State, as an employer, in promoting the efficiency of the public services it performs through its employees." *Munroe*, 805 F.3d at 466.

### i. Public Concern

Defendants do not contest that Goode and Pierce were speaking as citizens, nor argue that Goode and Pierce's activity disrupted public services. (Def. Brief at 23–25). Rather, they address

---

based on the substance of complaints she made as a union representative, rather a pure Association Clause claim based on her membership in the union.

the second element of the public concern test, asserting that "the purported protected speech simply amounts to employee grievances." *Id.* at 25.

There are two steps to the public concern inquiry: (1) identifying some statement that implicates a matter of public concern, and then (2) assessing the "content, form, and context of [that] statement, as revealed by the whole record." *Connick v. Myers*, 461 U.S. 138, 147–48 (1983). *see also Munroe*, 805 F.3d at 467 (noting that "courts should take into account the employee's motivation as well as whether it is important to our system of self-government that the expression take place"). On the first step, the key distinction is that "speech disclosing public officials' misfeasance is protected while speech intended to air personal grievances is not." *Falco v. Zimmer*, 767 F. App'x 288, 303 (3d Cir. 2019) (internal quotation omitted). As such, "mundane employment grievances" do not make the cut, *Munroe* at 805 F.3d 467, but allegations of discrimination or other illegal activity will. *See Azzaro v. Cty. of Allegheny*, 110 F.3d 968, 976 (3d Cir. 1997) (holding that discrimination by public officials is inherently a matter of public concern); Further, the plaintiff must "indicate that he wanted the public to learn of [the] purported misconduct." *Emigh v. Steffee*, 442 F. App'x 660, 665 (3d Cir. 2011).

At step two, the Court must find that the reference to a matter of personal concern is something more than a "multi-faceted personal 'gripe.'" *Miller*, 544 F.3d at 550–51 (explaining that courts cannot "'cherry pick' something that may impact the public while ignoring the manner and context in which that statement was made or that public concern expressed"); *see also Shearn v. West Chester Univ. of Pa.*, No. 14-3706, 2017 WL 1397236, at *12 (E.D. Pa. April 19, 2017) (granting summary judgment against plaintiff whose pursuit of employment grievance was focused on "her own treatment" even though it "arguably touched upon matters of public concern"). To be sure, the plaintiff may implicate a matter of public concern even if she complained only of her own

mistreatment; pure selflessness is not a prerequisite to First Amendment protection. *See Rode v. Dellarciprete*, 845 F.2d 1195, 1201–02 (3d Cir. 1988) (holding that an employee's comments regarding racial discrimination and animus were protected, even if they were expressed because of her own personal employment problems). But "[i]f the employee's speech relates only to his or her personal interest, the First Amendment does not protect the speech." *Borden v. Sch. Dist. of the Twp. Of E. Brunswick*, 523 F.3d 153, 168 (3d Cir. 2008).

### 1. Goode's Claims

Plaintiff's Fourth Amended Complaint focuses on the August 21, 2014 Petition Goode filed with the Camden Board of Education as protected activity underlying her First Amendment retaliation claim. (FAC at ¶¶ 77, 91). However, Plaintiffs' Opposition points to four other instances which they may be asserting are examples of protected activity:[5] (1) a meeting between Goode and Kim Buell-Alves, a representative of the District;[6] (2) a May 12, 2014 letter to Superintendent Rouhanifard (Doc. No. 104-17); (3) a May 13, 2014 letter to Commissioner of Education David Hespe (Doc. No. 104-18); (4) a June 23, 2014 letter to Superintendent Rouhanifard (Doc. No. 104-19); and (5) an August 21, 2014 Petition to the Camden Board of Education (Doc. No. 104-20).[7] (Pl. Brief at 27–28). Of these, the meeting with Kim Buell-Alves, the June 23 Letter to Rouhanifard, and the August 21 Petition fail at step one of the public concern test because they do

---

[5] Plaintiffs briefing simply lists these facts without any explanation of their significance, forcing the Court to guess as to Plaintiffs' intentions.

[6] Goode testified at her deposition that the information she conveyed to Buell-Alves was the same as in her first Petition to the Board of Education. (Pl. SDF at ¶ 214). As such, the Court analyzes this meeting in the same way as it analyzes the Petition.

[7] Goode also mentions a January 19, 2015 Second Amended Petition to the Camden Board of Education (Doc No. 104-21). (Pl. Brief at 28). However, this document is not mentioned at all in Plaintiff's Fourth Amended Complaint, nor are there any allegations that would appear to encompass it. As such, the Fourth Amended Complaint does not provide sufficient notice to Defendants that Goode intended bring a claim based upon the Second Amended Petition, and consequently the Court will not consider any such claim. *See Pickern v. Pier 1 Imports (U.S.), Inc.*, 457 F.3d 963, 968–69 (9th Cir. 2006) (rejecting plaintiff's attempt to raise new factual allegations on motion for summary judgment); *Fleming v. Lind-Waldock & Co.*, 922 F.2d 20, 24 (1st Cir. 1990) (noting that "summary judgment is not a procedural second chance to flesh out inadequate pleadings").

not raise a matter of public concern at all. Rather, they merely recite of Goode's personal gripes with the Danielson rubric and the conduct of Miles and Gehring as applied to her.[8]

By contrast, the May 12 letter to Rouhanifard and the May 13 letter to Hespe do raise matters of public concern. Goode wrote to Rouhanifard that her "bad evaluations from Ms. Gehring and the way Mr. Miles has been treating me is the result of my length of service and perhaps even my age." (Doc. No. 104-17 at 2). Similarly, she wrote to Hespe that "[a] large number of teachers, it appears older teachers are being given opinionate, untrue, and contradictory evaluations." (Doc. No. 104-18 at 2). These references to age-discrimination by public officials plainly touch upon a matter of concern.

Nevertheless, neither letter survives step two. *Miller* is highly illustrative. In that case, a probation officer was fired after writing a letter to a judge complaining about her supervisors' conduct. 544 F.3d at 546. In her letter, the officer mentioned that her supervisors ran their office ineffectively and referred to their clients as "scum," which the court viewed as "undoubtedly refer[ring] to matters of public concern." *Id*. at 549. But after a fact-intensive analysis, the court found that the letter did not survive the public concern inquiry. *Id*. at 546. In reaching this conclusion, the court emphasized the brevity of the letter's references to matters of public concern, the letter's opening sentence stating that the plaintiff was writing about the "stressful conditions" she was enduring, and the overall focus of the letter on the plaintiff's personal situation. *Id*. at 546, 549–51.

Just as in *Miller*, Goode's May 12 letter opens by indicating that she was "extremely upset about the bullying and harassment" from Miles and Gehring. (Doc. No. 104-17 at 2). Further, most

---

[8] In both the June 23, 2014 letter to Rouhanifard and the first Petition, Goode asserted that her evaluators were "biased." Although an allegation that the evaluators were biased against her due to her age, race, or other protected status may have been sufficient to survive step one, a plain assertion of bias is not. Without more, such an assertion only indicates that the evaluators were biased against Goode personally, which is not a matter of public concern.

of the body of the letter is focused on Goode's belief that her evaluations were unfair and her interactions with Miles and Gehring. The May 13 letter also devotes most of its attention to these same concerns. As such, the main thrust of both letters is Goode's personal grievances with the evaluation process; the references to age-discrimination are cherries that the Court is bound not to pick. Consequently, these letters are not protected speech. Goode's claim does not survive summary judgment.

### 2. Pierce's Claims

Pierce sets forth nine instances in which she allegedly spoke out on matters of public concern: (1) when she informed Miles during a principal's cabinet meeting that he was proposing actions that would violate the union contract, state law, or federal law (Doc. No. 104-14 at 5); (2) when she complained to Miles that he was illegally recording a staff meeting (*Id*.); (3) a December 2014 meeting with Byrd-Robinson at which Pierce informed her that she was illegally teaching general education classes (Pl. SDF at ¶ 349); (4) when she complained to Miles that she was illegally teaching general education and honors classes (*Id*. at ¶ 350); (5) a professional development meeting where she addressed Baynes on behalf of all the special education teachers and complained that he was not adequately coaching them (*Id*. at ¶ 370); (6) staff meetings during the 2014-15 and 2015-16 school years where she asked Miles why only older teachers were being moved from class to class (*Id*. at ¶¶ 356–58); (7) her rebuttal to a February 9, 2015 observation by Baynes setting forth her reasons for why it was unfair (Doc. No. 104-23); and (8) a rebuttal to Byrd's November 4, 2015 observation (Doc. No. 105-24); and (9) five "Inquiry and Complaint" forms Pierce filed with her union on March 2, 2016 (Def. SUMF at ¶ 89; Doc. No. 95-18 at 100–04). (Pl. Brief at 36–38).[9]

---

[9] Pierce also attempts to rely on an instance during the 2013-14 school year when she complained to a principal at Woodrow Wilson High School about an instance of age-discrimination she had observed (Doc. No. 104-15 at 5–6).

Of the above instances of alleged protected activity, numbers five, seven, eight, and nine plainly do no touch on any matter of public concern. Pierce's complaints about the quality of the coaching for the special education teachers did not implicate official misfeasance or discrimination but rather were focused on the internal administrative functioning of the school. Similarly, her evaluation rebuttals are almost entirely focused on arguing that her evaluations were unfair because they took place at inopportune times. The timing of her evaluations, without more, is not an issue of public concern.[10] And none of Pierce's Inquiry and Complaint forms do more than raise her personal grievances with Miles.[11]

In instances three and four, Pierce complained that she was illegally teaching general education and honors classes despite only being qualified to teach special education classes. As such, these complaints indicate that by scheduling Pierce for non-special education classes, Miles was either violating the law or otherwise being derelict in his duties. Such malfeasance is arguably a matter of public concern. However, when viewed in light of the whole record, it is clear that Pierce's motivation in raising these issues was her concern for her own performance evaluations and her personal liability for any parent-initiated lawsuit. (*See* Doc. No. 104-15 at 16 (Pierce Deposition) (explaining that after receiving Byrd- Robinson's evaluation, Pierce "went to her and

However, there are no allegations in the Fourth Amended Complaint indicating that Pierce engaged in First Amendment protected activity during the 2013-14 school year. For the same reasons Goode cannot rely on instances outside the scope of the Fourth Amended Complaint, Pierce cannot rely on this instance.

[10] Even if one concluded that the rebuttals raised the issue of the school providing inadequate resources for special education students, because their clear thrust is towards contesting the fairness of Pierce's evaluations, they would still flunk step two under *Miller*.

[11] In their Supplemental Statement of Disputed Facts, Plaintiffs claim that the grievances complain about Miles releasing Pierce's confidential information, (Pl. SDF at ¶ 329), an act of misfeasance that could conceivably be a matter of public concern. But none of Pierce's Inquiry and Complaint forms actually raise this issue; the first complains that Pierce was repeatedly cited for non-compliant lesson plans but was never provided with an example; the second that Pierce is teaching a class for which she was not certified without adequate support; the third that Pierce's schedule forced her travel from building to building carrying heavy materials; the fourth that she was not getting release time to work on individual education plans; and the fifth that Miles sent her a threatening email after she missed CAP meetings. To the extent that the second complaint touches on the issue of Pierce illegally teaching general education classes, it fails for same reason as her other similar allegations, as discussed below.

told her. You are judging me and evaluating me in a regular ed classroom. And then you are giving me negative marks when I'm a special ed certified teacher.")); (*Id.* at 19 (explaining that Pierce made her verbal complaints to Miles because she "want[ed] the bull's eye off my back" and that she would not have the money to pay the parents should they sue)); *see also Turner v. City & Cty. of S.F.*, 788 F.3d 1206, 1211 (9th Cir. 2015) (finding that complaints about violations of civil service rules were not on matters of public concern because of their focus on internal grievance). Pierce's overriding focus on her own situation mean that these complaints are also unprotected employment grievances under *Miller*, despite touching upon an issue of public concern.

Finally, numbers one and two involve complaints to Miles that he was either proposing illegal activity or was actively engaging in it by recording staff meetings. Although such allegations could be matters of public concern, because Pierce raised these issues directly to Miles, there is not a strong indication that Pierce intended to make the public aware of these issues. Further, given that Pierce has testified to nothing more than that Miles proposed illegal actions and she opposed him, with specifying the nature of those actions, it is difficult to ascertain how those actions may have impacted the public. And Pierce's opposition to Miles's recording of the staff meeting appears, based on the whole record, to be as much about protecting herself as ensuring Miles complied with the law. Given the private nature of these complaints and the lack of clarity as to how these issues really impacted the public interest, these instances do not survive the public concern test.

By contrast, number seven concerns complaints that Pierce made about age-discrimination in teacher scheduling at staff meetings. At these meetings, Pierce allegedly raised issues not only on her own behalf but also on the behalf of other teachers. It is also relevant that Pierce spoke in her capacity as a union representative. *See Lambert v. Richard*, 59 F.3d 134, 137 (9th Cir. 1995)

(stressing that employee spoke "as a union representative, not as an individual" when finding speech protected). As mentioned above, allegations of discrimination are always a matter of public concern, and given Pierce's focus on the situation of others, it is clear that these complaints were more than personal employment grievances. As such, they sufficiently touch on a matter of public concern.

These instances also pass the *Pickering* balancing test. As "[s]peech involving government impropriety occupies the highest rung of First Amendment protection," Miles bears a "truly heavy burden" in attempting to establish that the state's interest in efficiency and discipline outweigh Pierce's in commenting on government affairs. *McGreevy v. Stroup*, 413 F.3d 359, 365 (3d Cir. 2005). Yet Defendants make no argument that Pierce's activity was disruptive or that there was any other justification for curtailing her conduct. Accordingly, the Court finds that the *Pickering* balancing test weighs heavily in Pierce's favor; Pierce's complaints based on age-discrimination are protected by the First Amendment.

### ii. Clearly Established Right

Although Pierce engaged in activity the First Amendment protects, Miles retains qualified immunity for any retaliation unless such protection was clearly established at the time the relevant events occurred. A right is clearly established if it would have been "clear to a reasonable officer that his conduct was unlawful in the situation he confronted." *Saucier*, 533 U.S. at 202. The issue is a question of law. *Doughtery v. Sch. Dist. of Phila.*, 772 F.3d 979 (3d Cir. 2014). When assessing whether a right was clearly established, this Court may rely on decisions from the Supreme Court, the Third Circuit, and other Courts of Appeals. *See Schmidt v. Creedon*, 639 F.3d 587, 598 (3d Cir. 2011).

Although many cases stand for the proposition that public employees have a right to allege malfeasance by public officials, the Third Circuit has indicated that this is not a sufficiently specific clearly established right for purposes of denying qualified immunity. *De Ritis v. McGarrigle*, 861 F.3d 444, 458 n.12 (3d Cir. 2017). In an effort to identify a clearly established right with greater specificity, Plaintiffs point to the Third Circuit case of *McGreevy v. Stroup* as holding that "where the *Pickering* balancing factors weigh heavily in favor of the employee, the law is clearly established and qualified immunity is therefore unavailable." 413 F.3d at 366. Because Defendants did not offer any justifications for limiting Plaintiffs' speech, the *Pickering* factors weigh heavily in Plaintiffs' favor in this case as well. According to Plaintiffs, that is enough to defeat qualified immunity for Miles. (Pl. Brief at 31).

It is unclear if analogizing at even this lower level of generality is sufficient to overcome qualified immunity. *See De Ritis v. McGarrigle*, 861 F.3d 444, 458 n.12 (3d Cir. 2017) (indicating that a right is only clearly established if there is precedent "that is factually similar to the plaintiff's allegations, based on the specific context of the case"); *Bennis v. Gable*, 823 F.2d 723, 733 (3d Cir. 1987) (finding that "some but not precise factual correspondence" is required to overcome qualified immunity). Fortunately for Pierce, the facts of *McGreevy* are substantially similar to her situation. In *McGreevy*, a school nurse engaged in several acts of protected speech, including informing the Department of Health of unlicensed pesticide spraying at her school. 413 F.3d at 365. The nurse alleged that the defendants retaliated by lowering her performance evaluation. *Id.* As mentioned above, the Third Circuit found that the *Pickering* balancing test weighed heavily in the nurse's favor due to the lack of any justification for limiting the nurse's speech, and therefore concluded that the defendants had violated the nurse's clearly established rights. *Id.* at 366.

Pierce's situation differs from the nurse in *McGreevy* in some respects. Rather than go to an outside body, Pierce's complaints were made directly to Miles. Further, Pierce alleges that Miles retaliated not only by tampering with her performance evaluations but also by assigning her an arduous class schedule. But the core facts—a school employee reports misconduct, causes no disruption, but still suffers retaliation short of termination—are substantially similar.

Additional aspects of Pierce's situation indicate that a reasonable official would have known that retaliation was unlawful. Her complaints at staff meetings about age-discrimination were made in her capacity as a union representative, and it is clearly established that "the First Amendment protects the right of associations, such as unions, 'to engage in advocacy on behalf of their members.'" *Mrazek v. Stafford Twp.*, 744 F. App'x 69, 72–73 (3d Cir. 2018) (quoting *Smith v. Ark. State Highway Emp., Local 1315*, 441 U.S. 463 (1979)).[12] Also well-established is the proposition that a public employee's "right to protest [] discrimination—a matter inherently of public concern—is not forfeited by her choice of a private forum." *Connick*, 461 U.S. at 148 n.8. And retaliatory changes to an employee's work schedule may violate her First Amendment rights. *Shrum v. City of Coweta, Okla.*, 449 F.3d 1132 (10th Cir. 2006). Given these clearly established principles and the factual similarity to *McGreevy*, Miles is not entitled to qualified immunity. Pierce's Section 1983 and NJCRA claims survive summary judgment.

### C. CEPA

In Count X, Plaintiffs Goode and Pierce bring claims under the CEPA against Defendants Gehring and Miles. To make out a prima facie CEPA case, the plaintiff must show that:

> (1) he or she reasonably believed that his or her employer's conduct was violating either a law, rule, or regulation promulgated pursuant to law, or a clear mandate of public policy; (2) he or she performed a "whistle-blowing" activity described in

---

[12] Again, the court does not believe that Pierce is really making out a Free Association claim. Rather, in light of the precedents establishing the right of unions to advocate on behalf of their members, a reasonable official would have known that Pierce, as a union representative, had a right to advocate on behalf of the union's members.

> N.J.S.A. 34:19-3[]; (3) an adverse employment action was taken against him or her; and (4) a causal connection exists between the whistle-blowing activity and the adverse employment action.

*Lippman v. Ethicon, Inc.*, 119 A.3d 215, 226 (N.J. 2015). The New Jersey Supreme Court has repeatedly emphasized that the "CEPA is a remedial statute, and as such it should be construed liberally to effectuate its important social goal." *Chiofalo v. State*, 213 A.3d 527, 540 (N.J. 2019) (internal quotation omitted). Defendants contend that both claims fail to satisfy elements one, two, and three. (Def. Brief at 23–24).[13]

### i. Whistleblowing Activity

Defendants assert that neither Goode nor Pierce ever engaged in whistleblowing activity. In relevant part, the CEPA defines whistleblowing activity to include "disclos[ing] or threaten[ing] to disclose to a supervisor or to a public body an activity, policy or practice of the employer . . . that the employee reasonably believes is in violation of a law, or a rule or regulation promulgated pursuant to law . . . [or] is fraudulent or criminal." N.J.S.A. 34:19-3(a). The definition also encompasses "[o]bject[ing] to, or refus[ing] to participate in any activity, policy or practice which the employee reasonably believes [] is in violation of a law, or a rule or regulation promulgated pursuant to law . . . is fraudulent or criminal . . . [or] is incompatible with a clear mandate of public policy concerning the public health, safety or welfare or protection of the environment." *Id*. at 34:19-3(c). Plaintiffs appear to bring claims pursuant to both 34:19-3(a) and 34:19-3(c) and assert that the same instances they claim are First Amendment protected activity are also instances of whistleblowing.

---

[13] Defendants also contend that Goode's claim is barred by the CEPA's one-year statute of limitations. Because the Court concludes that Goode's claim fails on the merits, it does not address this issue. Further, Defendants devote a single clause of one sentence to claiming that Plaintiffs have not satisfied the causation element. (Def. Brief at 24). Because this assertion is bereft of any legal or factual support, the Court finds that Defendants have not met their burden as the summary judgment movant, and therefore will not address the causation element.

Plaintiffs need not show that the activity they complained of was actually illegal or fraudulent; rather, they need only show that they reasonably believed that the activity was illegal or fraudulent. *Estate of Roach v. TRW, Inc.*, 754 A.2d 544, 552 (N.J. 2000); *see also Mehlman v. Mobil Oil Corp.*, 707 A.2d 1000, 1016 (N.J. 1998) ("The object of CEPA is not to make lawyers out of conscientious employees."). At this stage, the Court "must make a threshold determination that there is a substantial nexus between the complained-of conduct and a law or public policy identified by the court or the plaintiff." *Dzwonar v. McDevitt*, A.2d 893, 901 (N.J. 2003).

CEPA does not protect wholly private grievances. *See Maw v. Advanced Clinical Comm., Inc.*, 846 A.2d 604, 608 (N.J. 2004) ("[T]he complained of activity must have public ramifications, and that the dispute between employer and employee must be more than a private disagreement."); *Mehlman*, 707 A.2d at 1013 ("[T]he offensive activity must pose a threat of public harm, not merely private harm or harm only to the aggrieved employee."); *Beasely v. Passaic Cty.*, 873 A.2d 673, 685 (N.J. Sup. Ct. App. Div. 2005) (noting that CEPA is not intended to "settle internal disputes at the workplace" (internal quotation omitted)). Nor does CEPA shield "[v]ague and conclusory complaints." *Battaglia v. United Parcel Service, Inc.*, 70 A.3d 602, 627 (N.J. 2013) (finding that letter phrased in general terms did not put defendant on notice that plaintiff was blowing the whistle on alleged credit card fraud). As such, the whistleblowing inquiry under CEPA is substantially similar to the public concern inquiry under the First Amendment.

Given this similarity, the Court finds that its analysis of Goode and Pierce's claims under the First Amendment applies to their CEPA claims as well. All of Goode's complaints either did not touch on an issue of public interest or were too vague or conclusory to put Defendants on notice that she was raising issues of age-discrimination or other illegal activity. The same is true of most of Pierce's complaints as well, except for her complaints made in her capacity as a union

representative regarding instances of age-discrimination. There is a substantial nexus between the content of these complaints and laws prohibiting age-discrimination, namely the ADEA and the NJLAD. Consequently, at this stage Pierce has submitted sufficient evidence that she engaged in whistleblowing activity under CEPA.

### ii. Adverse Employment Action

The CEPA defines retaliation to include the "discharge, suspension or demotion of an employee, or other adverse employment action taken against an employee in the terms and conditions of employment." N.J.S.A. 34:19-2(e). The Third Circuit has interpreted this language to mean that "in order for [retaliatory] actions to qualify under CEPA, they must have impacted the employee's compensation or rank or be virtually equivalent to discharge." *Fraternal Order of Police, Lodge 1 v. City of Camden*, 842 F.3d 231, 241 (3d Cir. 2016) (internal quotation omitted) (finding that "placement on an 'abuse of sick time' list, the cancellation of a vacation, and a visit by an Internal Affairs officer" was not adverse employment action under CEPA). [14] Nevertheless, retaliation can take the form of "many separate but relatively minor instances of behavior directed against an employee that may not be actionable individually but that combine to make up a pattern of retaliatory conduct." *Green v. Jersey City Bd. of Educ.*, 828 A.2d 883, 891 (N.J. 2003).

Contrary to Defendants' assertion, the fact that Pierce voluntarily resigned her position is not fatal to her CEPA claim.[15] *See Green*, 828 A.2d at 891 (finding that defendant retaliated by moving teacher to a substandard classroom, lowering her performance evaluations, and engaging in other hostile acts until teacher resigned); *see also Donelson v. DuPont Chambers Works*, 20

---

[14] *But see O'Keefe v. State Dep't of Labor*, No. MER-L-1687-02, 2007 WL 1975603, at *9 (N.J. Sup. Ct. App. Div. July 10, 2007) (noting that "even if retaliatory conduct does not affect an employee's job title or compensation, it can qualify as adverse employment action under N.J.S.A. 34:19–2(e)").

[15] The case Defendants rely on for that proposition, *Boody v. Twp. of Cherry Hill*, was in the relevant section only discussing claims under 42 U.S.C. § 1983, rather than claims under the CEPA. 997 F. Supp. 562, 570 (D.N.J. 1997).

A.3d 384, 392 (N.J. 2011) (finding that defendant retaliated against plaintiff by "making false accusations of misconduct, giving negative performance reviews, issuing an unwarranted suspension, and requiring pretextual mental-health evaluations—causing the employee to suffer a mental breakdown and rendering him unfit for continued employment").

In this case, Pierce has testified that Miles retaliated against her by taking away her classroom, forcing her to use a classroom without visual aids, forcing her to travel substantial distances between classes while carrying heavy equipment, and by tampering with her performance evaluation process. While these incidents are not as extreme as those examined by the New Jersey Supreme Court in *Green* and *Donelson*, there are important similarities, particularly regarding the manipulation of performance evaluations. Importantly, the cumulative effect of the low evaluations raised the specter of tenure charges for Pierce, impacting her job security. *Cf. Cokus v. Bristol Myers Squibb Co.*, 827 A.2d 1173, 1183 (N.J. Sup. Ct. L. Div. 2002) (finding negative performance evaluations were not an adverse employment action where plaintiff was told her job was safe and the evaluation was never placed in her personnel file). And these incidents are certainly more significant than the alleged acts of retaliation the Third Circuit dismissed in *Fraternal Order of Police*. In light of the mandate to construe the CEPA liberally, the Court finds that the pattern of retaliatory activity Pierce testified to was virtually equivalent to discharge. Her claim survives summary judgment.

### D. NJLAD

In Count VI, Plaintiffs Goode, Mann, Dequito, and Atwater bring claims under the NJLAD for age-discrimination against Defendant Gehring, while Plaintiff Pierce brings a claim against Defendant Miles. NJLAD age-discrimination claims use the same analytical framework as ADEA claims, the *McDonnell Douglas* burden shifting framework. *Catullo v. Liberty Mut. Grp., Inc.*,

510 F. App'x 178, 180 (3d Cir. 2013). To make out a prima facie case of age-discrimination, a plaintiff must show that: "(1) the plaintiff is at least forty years old; (2) the plaintiff suffered an adverse employment decision; (3) the plaintiff was qualified for the position in question; and (4) the adverse action occurred under circumstances that create an inference that plaintiff's age was a motivating factor." *Dodson v. Coatesville Hosp. Corp.*, 773 F. App'x 78, 80 (3d Cir. 2019). Defendants contend that Plaintiffs cannot establish elements two and four. (Def. Brief at 16).

### i.  Adverse Employment Action

The standard for showing an adverse employment action under the NJLAD is not the same as the standard under the CEPA. *See Donelson*, 20 A.3d at 253–54 (rejecting lower court's conclusion that the CEPA and the NJLAD should be construed identically). Rather, in this context an adverse employment action is "an action by an employer that is serious and tangible enough to alter an employee's compensation, terms, conditions, or privileges of employment." *Jones v. Southeastern Pa. Transp. Auth.*, 796 F.3d 323, 326 (3d Cir. 2015). In this case, it is undisputed that all of the plaintiffs suffered negative performance evaluations, and it is also undisputed that negative performance evaluations, without more, are not an adverse employment action. *See, e.g.*, *Smart v. Ball State Univ.*, 89 F.3d 437, 442 (7th Cir. 1996); *Foster v. Ashcroft*, No. 05-1734, 2006 WL 1995305, at *2 (D.N.J. 2006) (noting that "[r]esults of a performance evaluation do not constitute an adverse employment action unless they have some tangible effect upon the recipient's employment" (internal quotation omitted)).

As such, the issue is whether Plaintiffs can point to the necessary "something more" flowing from their negative performance evaluations. Plaintiffs assert that due to their low evaluation scores, some of them were actually issued tenure charges while all faced the possibility of being charged. (Pl. Brief at 15). But no plaintiff was actually dismissed due to the tenure

charges, as they all chose to resign rather than face them. And unfortunately for Plaintiffs, that choice makes all the difference.

The New Jersey Supreme Court has held that "without more, an employer's filing of a disciplinary action cannot form the basis of a LAD complaint." *Shepherd v. Hunterdon Dev. Ctr.*, 803 A.2d 611, 626 (N.J. 2002). As such, the filing of tenure charges, much less the possibility of filing them, cannot serve as Plaintiffs' "something more" unless they can offer an additional consequence of the negative performance evaluations. Plaintiffs Atwater and Ballinger point to their placement on paid administrative leave as that something more. (Pl. Brief at 15). But the Third Circuit has established that placement on paid administrative leave is not an adverse employment action unless there is something more. *Jones*, 796 F.3d at 326. Although the holdings of both *Jones* and *Shepherd* may seem curious to the uninitiated, the logic is that because the terms of employment include the potential application of disciplinary procedures, the application of such disciplinary procedures does not alter the employee's status. *Id*. (citing *Joseph v. Leavitt*, 465 F.3d 87, 91 (2d Cir. 2006)).

At this point one may fairly wonder where the "something more" rabbit hole ends. The answer is where the plaintiff can show that the negative performance evaluation, disciplinary action, or administrative leave eventually led to a tangible change in the circumstances of employment—being fired, demoted, or something equally grave. Plaintiffs Goode, Mann, Atwater, and Dequito cannot show the needed tangible consequence of their negative performance evaluations. As such, the NJLAD offers them no relief.

In addition to the possibility of tenure charges, Plaintiff Pierce points to the changes to her schedule as an independent adverse employment action. (Pl. Brief at 15). Such a change can be an adverse employment action if it was "more than a 'trivial' or minor change in the employee's

working conditions." *Mondzelewski v. Pathmark Stores, Inc.*, 162 F.3d 778, 788 (3d Cir. 1998) (concluding that plaintiff's assignment to 9:30 a.m. to 6:00 p.m. shift was an adverse employment action when most other employers in the same role either worked from 6:00 a.m to 2:00 p.m. or from noon until evening and plaintiff's shifts were considered "punishment shifts"); *see also Meyers v. Bd. of Educ.*, No. 07-5058, 2010 WL 4387503, at *8 (D.N.J. Oct. 29, 2010) (finding that altering a teacher's schedule was an adverse employment action under the NJLAD).

In this case, the alleged changes to Pierce's schedule forced her to frequently travel between classrooms carrying fifty-five pounds of supplies, causing her physical distress. (Pl. SDF at ¶¶ 322–25). Although this change may not have been overly burdensome, it is at least as disruptive as being forced to work non-standard daytime hours, as in *Mondzelewski*. As such, Pierce has submitted sufficient evidence of an adverse employment action for the purposes of summary judgment. [16]

### ii. *Inference of Age-Discrimination*

A plaintiff may establish the necessary inference of age-discrimination by showing that they were replaced by a younger employee, that "during a general reduction in force, younger employees were retained when plaintiff was fired, or with other facts sufficient to create an inference that an employment decision was based on age." *Dodson*, 773 F. App'x at 80 n.3. Although more evidence may be required later in the *McDonnel-Douglas* analysis once the employer has proffered a non-discriminatory justification, "[t]he evidentiary burden at this stage

---

[16] Some of Pierce's deposition testimony suggests that she had a schedule requiring her to move from classroom to classroom and across the breezeway, carrying her supplies, before Miles arrived at Woodrow Wilson High School. (Doc. No. 95-13 at 59–62). Although this testimony could be relevant to a jury in assessing Pierce's claims, at this point the Court cannot say for certain how Pierce's schedule changed after Miles became the principal. But viewing the record in the light most favorable to Pierce, it seems possible to draw an inference that Pierce's schedule in 2014–15 was detrimentally different than her schedule in 2013-14. Consequently, her claim of an adverse employment action is adequate to survive summary judgment. *See Mondzelewski*, 162 F.3d at 788 (explaining that while "the relatively mild nature of [defendant's] allegedly retaliatory conduct may not be without legal significance, it is not dispositive with respect to the narrow legal question now before us").

is rather modest: it is to demonstrate . . . that discrimination *could* be a reason for the employer's action." *Marzano v. Computer Science Corp., Inc.*, 91 F.3d 497 (3d Cir. 1996). To show that age-discrimination could be a reason for Miles's conduct, Pierce relies on her own observations of the school administration treating older teachers differently and on allegedly discriminatory comments Miles made to her.[17]

However, plaintiffs may use even single instances of ambiguous "stray remarks" as circumstantial evidence of discrimination. *Brewer v. Quaker State Oil Refining Corp.*, 72 F.3d 326, 333 (3d Cir. 1995) (concluding that CEO's statement that the mid-40s age group was the company's future was "relevant evidence of discrimination"); *see also Smith v. M&M Mgmt. Co.*, No. 17-7978, 2019 WL 1397401, at *12 (D.N.J. Mar. 28, 2019) (denying summary judgment on NJLAD age discrimination claim after concluding that supervisor's single instance of calling employee a "dinosaur" was evidence of discrimination). In this case, Miles made two separate comments that could give rise to an inference of age-discrimination: one where he told Pierce that he believed older teachers would struggle adapting to the new system, (Doc. No. 104-5 at 49), and another where he told Pierce that she reminded him of his mother, which Pierce believed to be a comment on her age (*Id*. at 55). On one of these occasions Miles remarked to Pierce that "you can't teach an old dog new tricks." (Pl. SDF at ⁋ 362). At least the first of these remarks apparently came shortly after Miles unfavorably altered Pierce's schedule. (Doc. No. 104-5 at 49). Given this temporal proximity to Miles's relevant conduct, and Pierce's testimony that other older teachers were being subjected to similar discriminatory treatment by Miles, there is enough evidence to

---

[17] The parties devote much of their attention to debating the significance of statistical evidence on the teacher evaluations across the Camden City School District, which shows that that older teachers and younger teachers were scored partially effective but that older teachers received the partially effective rating at a higher rate. (Pl. Brief at 22). While Pierce may introduce and rely on such evidence, it is not especially important in an individual disparate treatment case such as this. *See Abrams v. Lightolier, Inc.*, 50 F.3d 1204, 1217 (3d Cir. 1995). As Pierce's other evidence is sufficient to meet her burden to establish her prima facie case, and that is the only issue in play on this motion for summary judgment, the Court finds it unnecessary to evaluate the statistical evidence.

raise a factual question as to Miles's intentions. As such, Pierce has adequately made out her claim of age-discrimination to survive this motion for summary judgment.

### E. NJLAD—Hostile Work Environment

In Count VII, Pierce brings a claim under the NJLAD against Miles for creating a hostile work environment due to her age. In order to state such a claim, a plaintiff must show that "the complained-of conduct (1) would not have occurred *but for* the employee's [age]; and it was (2) *severe or pervasive* enough to make a (3) *reasonable* [person of that age] believe that (4) the conditions of employment are altered and the *working environment is hostile or abusive*." *Lehmann v. Toys R Us, Inc.*, 626 A.2d 445, 453 (N.J. 1993).

When evaluating hostile work environment claims, courts should consider the "totality of the circumstances," rather than "individual incidents." *Andrews v. City of Philadelphia*, 895 F.2d 1469, 1482–84 (3d Cir.1990). Courts may consider "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." *Feraro–Bengle v. Randstad North Am.*, L.P., No. 03-1650, 2006 WL 2524170, at *4 (D.N.J. Aug.30, 2006) (quoting *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 23, 114 S. Ct. 367, 126 L.Ed.2d 295 (1993) (internal quotation marks omitted)). Even "one incident of harassing conduct can create a hostile work environment." *Taylor v. Metzger*, 152 N.J. 490, 499, 706 A.2d 685, 689 (1998). But mere "speculations, generalities, and gut feelings, however genuine, do not permit an inference of discrimination to be drawn." *Chambers v. Heidelberg USA, Inc.*, No. 04–583, 2006 WL 1281308, at *6 (D.N.J. May 5, 2006) (citation omitted).

As with her other claims, Pierce points to the loss of her classroom and the changes to her schedule as evidence of a hostile workplace. (Pl. Brief at 25). She also asserts the failure of anyone

to model the implementation of the instruction to her set her up to fail. *Id*. Defendants assert that this conduct was not sufficiently severe of pervasive.[18] (Reply at 15–16).

The standard for severe or pervasive conduct under the NJLAD is the same as under Title VII. *Lehmann*, 626 A.2d at 455. In determining whether harassment is "severe or pervasive," discrimination is pervasive when incidents "occur either in concert or with regularity." *Andrews*, 895 F.2d at 1484. "Isolated incidents" are only severe enough to sustain a claim for a hostile work environment if "extremely serious." *Faragher v. City of Boca Raton*, 524 U.S. 775, 788 (1998). No "magic threshold" exists as to a number of required incidents, and frequency must be balanced against other factors, such as "its severity, whether it is physically threatening or humiliating, or a mere offensive utterance, and whether it unreasonably interferes with an employee's work performance." *Faragher*, 524 U.S. at 787–788; see also *West v. PECO*, 45 F.3d 744, 757 (3d Cir.1995) ("frequency. . . is to be considered in context, including the severity of the incidents").

The conduct Pierce complains of fails to meet this standard. Although the changes to her schedule were sufficiently impactful to constitute an adverse employment action, they are not so severe as make her working environment unbearable. *See Parker v. G4s Secure Solutions USA Inc.*, No. 16-2993, 2017 WL 1058463 (D.S.C. Mar. 3, 2017) (dismissing hostile work environment claim based on frequent changes to plaintiff's work schedule); *see also McKinnon v. Gonzales*, 642 F. Supp. 2d 410, 423 (D.N.J. 2009) (noting that "it is well-settled that difficult or stressful working conditions are not tantamount to a 'hostile' work environment" (internal quotation omitted)).

---

[18] Oddly, Defendants direct most of their attention to arguing why the comments Miles made to Pierce about working with older people, discussed above, did not create a hostile work environment. Yet Plaintiffs do not rely on these comments as evidence of a hostile work environment at all in their brief. The Court trusts that Plaintiffs know which evidence best serves their case, and therefore only addresses the evidence they actually direct the Court's attention to.

With regard to Pierce's claim of being set up to fail by being denied instruction, the Third Circuit has suggested that an employer may create a hostile work environment by "deliberate sabotage of a victim's work performance, such as simply assigning her task that are impossible to accomplish." *Cardenas v. Massey*, 269 F.3d 251, 262 n.8 (3d Cir. 2001) (internal quotation omitted) (finding plaintiff was set up to fail when he was given contradictory instructions and berated when he failed to comply). However, Miles's failure to arrange the instruction Pierce desired is hardly the sort of deliberate sabotage seen in cases that satisfy this standard, such as *Cardenas*. Further, Pierce's deposition testimony indicating that many younger teachers were also unable to obtain this instruction indicates that this conduct was not occurring because of her age. *See* (Doc. No. 104-15 at 38 ("And I'm almost sure I said it to Mr. Miles, I need another . . . coach . . . . Every teacher that had [Mr. Baynes as a coach] was saying it . . . . I am not learning, he's not coaching me.")). As such, Pierce's NJLAD hostile work environment claim is dismissed.

### F. Doctrine of Fundamental Fairness

In Count IX, Plaintiffs bring claims against Gehring and Miles under New Jersey's doctrine of fundamental fairness. The doctrine of fundamental fairness "serves to protect citizens generally against unjust and arbitrary governmental action, and specifically against governmental procedures that tend to operate arbitrarily. It serves . . . as an augmentation of existing constitutional protections or as an independent source of protection against state action." *Constantine v. Twp. of Bass River*, 967 A.2d 882, 891 (N.J. Super. Ct. App. Div. 2009) (internal quotation omitted). In order for the doctrine to apply, there must be a "determination to protect citizens generally against unjust and arbitrary governmental action, and specifically against governmental procedures that tend to operate arbitrarily. [It] serves . . . as an augmentation of existing constitutional protections or as an independent source of protection against state action." *Doe v. Poritz*, 662 A.2d 367, 422

(N.J. 1995). "Fundamental fairness is a doctrine to be sparingly applied. It is appropriately applied in those rare cases where not to do so will subject the defendant to oppression, harassment, or egregious deprivation." *Id.* at 421 (internal quotation marks omitted) (quoting *State v. Yoskowitz*, 563 A.2d 1 (N.J. 1989) (Garibaldi, J., concurring and dissenting)).

Plaintiffs fail to point the Court towards any case applying the doctrine of fundamental fairness in a remotely analogous situation. Further, applying the doctrine here would risk permitting every government employee in New Jersey to transform their employment grievances into an issue of fundamental fairness—in direct conflict with the New Jersey Supreme Court's directive that the doctrine be applied sparingly. As such, the doctrine of fundamental fairness does not provide a basis for relief for Plaintiffs, and these claims are dismissed.

## IV. DEFENDANTS' MOTION TO SEAL

Defendants seek to seal Exhibits A through N attached to their Motion for Summary Judgment (Doc. Nos. 95-2–95-23). Requests to seal are governed by Local Civil Rule 5.3, which provides, in pertinent part, that a request to seal must be presented by motion, and that the motion papers must describe "(a) the nature of the materials or proceedings at issue, (b) the legitimate private or public interests which warrant the relief sought, (c) the clearly defined and serious injury that would result if the relief sought is not granted, and (d) why a less restrictive alternative to the relief sought is not available," L. Civ. R. 5.3(c)(2).

It is well established that there is a "common law public right of access to judicial proceedings and records," *In re Cendant Corp.*, 260 F.3d 183, 192 (3d Cir. 2001), but that, "[i]n order to overcome this presumption of a public right of access, the movant must demonstrate that 'good cause' exists for the protection of the material at issue." *Securimetrics, Inc. v. Iridian Techs., Inc.*, Civ. No. 03-4394, 2006 WL 827889, at *2 (D.N.J. Mar.30, 2006). Good cause exists when a

party makes a particularized showing that disclosure will cause a "clearly defined and serious injury to the party seeking closure," *id.* (citing *Pansy v. Borough of Stroudsburg*, 23 F.3d 772, 786 (3d Cir. 1994)), and a Motion to Seal can be granted when the movant proves that the information is confidential in nature such that allowing the general public to access the information will cause a specific and serious injury, *Pansy*, 23 F.3d at 788.

Defendants make no meaningful effort to satisfy any element of their burden. Their motion has no brief attached to it. Rather, they only include an extremely terse certification from defense counsel, Richard L. Goldstein, attesting that "[m]uch of the discovery exchanged in this case includes confidential personnel records." (Doc. No. 99-1 at ¶ 2). Yet the overwhelming majority of the documents Defendants seek to seal are not confidential personnel records. Rather, Exhibits D through N consist of thousands of pages of deposition testimony, and Defendants offer no explanation of why *any* of it, much less all of it, should be kept from the public. Even if there is some material in these reams of paper that could cause a specific and serious injury to someone, surely there is a less restrictive alternative than wholesale sealing. The Court simply will not seal such a vast amount of material on such an obviously deficient showing.

By contrast, Exhibits A through C do actually consist of personnel records. Exhibit A is a list of all the teachers in the District who received a summative rating of partially effective or lower at the end of the 2013-14 school year. (Doc. No. 95-2). Exhibit B is a list of all the teachers in the District who were placed on a CAP for the 2014-15 school year. (Doc. No. 95-3). Exhibit C contains the District's rosters of all teachers for the 2013-14 school year through the 2017-18 school year. (Doc. No. 95-4). None of these exhibits contains any names, but each identifies the teachers by age, job title, and school; Exhibit C additionally identifies the teacher by home city, state, and zip code. Given that the overwhelming majority of these teachers are not parties to this

litigation, that Defendants do have a legitimate interest in maintaining the confidentiality of their personnel records, that the release of these employment records could adversely effect the District's ability to manage its workforce, and that there is no less restrictive alternative, the Court will seal Exhibits A through C.

## V.    CONCLUSION

For the forgoing reasons Defendants' Motion for Summary Judgment (Doc. No. 95) is **GRANTED IN PART** and **DENIED IN PART** such that: Plaintiffs' claims against the District under the ADEA are **DISMISSED WITH PREJUDICE**; Plaintiffs' claims against the District under the NJLAD and the CEPA are **DISMISSED** without prejudice to refiling in a court of competent jurisdiction; Plaintiff Pierce's claims against Miles under Section 1983, the NJCRA, the CEPA, and the NJLAD for age-discrimination survive as described above; and all other claims are **DISMISSED WITH PREJUDICE**. Further, Defendants' Motion to Seal (Doc. No. 99) is **GRANTED IN PART** and **DENIED IN PART** such that only Exhibits A through C (Doc. Nos. 95-2–95-4) are **SEALED** while the remainder of Defendants' exhibits (Doc. Nos. 95-5–95-23) will be available to the public.


Dated:  11/22/2019                              /s/ Robert B. Kugler
                                                ROBERT B. KUGLER
                                                United States District Judge